Law Office of Adam Pennella
Adam Pennella, State Bar No. 246260
717 Washington Street
Oakland, CA 94607
Phone (510) 451-4600
Fax (510) 451-3002

Counsel for Defendant
DAVID EDUARDO CRUZ CRUZ

UNITED STATES DISTRICT COURT
NOTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>DAVID EDUARDO CRUZ CRUZ,<br><br>Defendant | Case No.: CR 20-059 MMC<br><br>**DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR VARIANCE**<br><br>Date: October 21, 2020<br>Time: 2:15 p.m.<br>Honorable Maxine M. Chesney |

Defendant David Eduardo Cruz-Cruz respectfully submits the following sentencing memorandum and motion for variance.

Mr. Cruz-Cruz will be before this Court on the above date and time for change plea and sentencing. He will accept full responsibility for the entirety of his conduct and plead guilty to Counts One through Three of Indictment (see ECF Doc 1), which charge him with knowingly and intentionally conspiring to distribute and possess with the intent to distribute a mixture containing methamphetamine (Count One), a mixture containing a detectable amount of cocaine (Count Two) and a mixture containing a detectable amount of heroin (Count Three). Those guilty pleas will be entered pursuant to the terms of a plea agreement made under Federal Rule of Criminal Procedure 11(c)(1)(B), in which the parties agree on Guidelines calculation of an

DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR VARIANCE 1

1  adjusted offense level 17,[1] and the government will recommend at the low end of the Guidelines

2  range.  The Modified Presentence Investigation Report calculates Mr. Cruz-Cruz's Criminal

3  History Category as II, resulting in a Guidelines range of 27-33 months.

4      For the reasons set forth below, a sentence of 27 months would be far greater necessary

5  to effect the purposes of federal sentencing; moreover, it would result in inappropriate disparity

6  among similarly situated defendants, and particularly Mr. Cruz-Cruz's co-defendant, Guillermo

7  Hernandez-Escobar, who was sentenced to six months based on more extensive criminal

8  conduct.

9  **INTRODUCTION**

10      What is clear from the entirety of the offense conduct in this case is that Mr. Cruz-Cruz's

11  co-defendant committed more extensive criminal conduct than did Mr. Cruz-Cruz.  Nonetheless,

12  the government asks this Court to hold Mr. Cruz-Cruz over four times more accountable simply

13  because he possessed more drugs on his person on the day of the arrest leading to the filed

14  charges in this case.  That is not only unfair, but contravenes one of the most important tenets of

15  federal sentencing, to "avoid unwarranted sentence disparities among defendants with similar

16  records who have been found guilty of similar conduct."  (18 U.S.C. § 3553(a)(6)).

17      Moreover, the record in this case suggests that the two defendants appear to be treated

18  mathematically differently under the U.S. Sentencing Guidelines. Mr. Hernandez-Escobar's base

19  offense level is consistent with the cocaine powder Guidelines: for possession of 7.1 grams (net)

20  of cocaine base (which would trigger a base offense level of 16) the government agreed to a base

21  offense level of 12 (which is consistent with a powder cocaine Guidelines).  (See ECF Doc. 32,

22

23  [1] In the Plea Agreement lodged with the Court and provided to Probation, the adjusted offense level is 21 based on a base offense level of 24 and a three-point reduction for acceptance of responsibility.  Based on further discussions regarding avoiding disparity among defendants in this case, the government is agreeing that the appropriate base

24  offense level should be 20, resulting in an adjusted offense level of 17.

DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR VARIANCE     2

*United States' Sentencing Memorandum As To Defendant Guillermo Hernandez-Escobar*, p. 5:2-7, fn 2[2]). If a similar calculation was used for Mr. Cruz-Cruz, the base offense level would be 18.[3] Notwithstanding the government's recent agreement to a lower base offense level of 20 for Mr. Cruz-Cruz – which assists in reducing disparity among co-defendants – Mr. Cruz-Cruz still appears to be treated differently. As a result, this Court should consider that fact when considering a downward variance.

Indeed, there are persuasive reasons for the Court to vary downward to account for the national disparate treatment between crack and powder cocaine defendants. While the law originally treated 1 gram of crack cocaine as the equivalent of 100 grams of powder cocaine at sentencing, it now imposes an 18:1 ratio. Neither are based on scientific or empirical research on any consequential difference between powder and crack cocaine. This excessive ratio has resulted in disparate sentences for minority defendants like Mr. Cruz-Cruz who represent the majority of defendants convicted of crack cocaine offenses nationally.

The Supreme Court has made clear this Court has the authority to categorically reject the Sentencing Guidelines' disparate treatment of powder and crack cocaine and adopt whatever ratio it believes is reasonable. *Spears v. United States*, 555 U.S. 261, 264 (2009); *Kimbrough v. United States*, 552 U.S. 85, 91 (2007). As one district court has explained, the 18:1 ratio—like the 100:1 ratio it replaced—"is unsupported by fact, law, or policy." *United States v. Gardner*, 20 F. Supp.3d 468, 469 (S.D.N.Y. 2014). It is not alone; other courts around the country— including several judges in the Northern District of California—have rejected the disparity

---

[2] The government notes that "at the time of his initial arrest, [Hernandez-Escobar] possessed 7.1 grams net of cocaine base. This is a sufficient drug quantity to support a Base Offense Level of 16." (See USSG 2D1.1(c)(12), assigning a BOL of 16 for between 5.6-11.2 grams of cocaine base). However, the government agreed to a base offense level of 12 for Mr. Hernandez-Escobar, which would be based on "less than 50 grams" of powder cocaine. (See USSG 2D1.1(c)(14)).

[3] When calculating Converted Drug Weight ("CDW") (see USSG §2D1.1, application note 8(D)) using a 1:1 ratio for powder and crack cocaine, the drugs possessed by Mr. Cruz-Cruz would result in a CDW of 50.54 KG CDW, consistent with a base offense level of 18. (See USSG 2D1.1(c)(11)).

between powder and crack cocaine and instead harmonized sentencing for the two forms of cocaine by either adopting a 1:1 ratio at sentencing, or granting a downward variance from the crack cocaine Sentencing Guidelines range.  Mr. Cruz-Cruz requests that this Court do so here.

Mr. Cruz-Cruz also asks this Court to vary downward due to his personal circumstances and history.  He has been in custody since February 24, 2020, which is the longest time in custody he has ever served.  Moreover, while in Santa Rita Jail, he volunteered to work in the kitchen (without pay), where he was one of a number of inmates who contracted COVID-19.  Finally, given that he is here illegally and his crime of conviction is an aggravated felony under immigration law, his deportation to the violent and impoverished nation of Honduras is effectively a foregone conclusion.[4]

Mr. Cruz-Cruz therefore asks this Court to exercise its authority to vary from the Guideline range and impose a time served sentence of approximately eight months.  Such a sentence (1) takes into account the unreasonable Sentencing Guidelines disparity between crack and powder cocaine, (2) ensures Mr. Cruz-Cruz is treated similarly to other defendants sentenced in crack cocaine cases in the district, (3) avoids unwarranted sentencing disparity between him and his arguably more culpable co-defendant, (4) is consistent with other sentences handed down in recent Tenderloin drug sale cases in the District, and (5) not only accounts for the additional punishment of suffering from COVID-19 transmission while in custody at Santa Rita Jail but also removes him from what is demonstrably the most dangerous place to be during a pandemic: a jail.

---

[4] Mr. Cruz-Cruz's conviction under § 841 is a categorical "aggravated felony" under immigration law and he will be ineligible for any relief from deportation.  *See* 8 U.S.C. § 1101(a)(43)(B) (defining "aggravated felony" in part as "illicit trafficking in a controlled substance (as defined in [21 U.S.C. § 802]), including a drug trafficking crime (as defined in [18 U.S.C. § 924(c)])"); *see also United States v. Alvarado-Pineda*, 774 F.3d 1198, 1201 (9th Cir. 2014) ("noncitizens convicted of aggravated felonies are removable on that basis…and are ineligible for almost all forms of discretionary relief.") (citations omitted).  If he decides to illegally return to the United States, he can be prosecuted for illegal reentry after removal under 8 U.S.C. § 1326, and subject to a harsher statutory penalty.  *See* 8 U.S.C. § 1326(b)(2) (statutory maximum of 20 years for illegal reentry defendant with a prior "aggravated felony").

**RELEVANT CASE HISTORY AND OFFENSE CONDUCT**

The discovery provided and documents filed in the case summarizes SFPD Officer Christina Hayes' months' long surveillance of Mr. Hernandez-Escobar dealing drugs in the Tenderloin. (See ECF Doc 32-2, filed 8/5/20, Exhibit A to *Declaration of Marja-Liisa Overbeck in Support of The United States' Sentencing Memorandum for co-defendant Guillermo Hernandez Escobar*, hereinafter referred to as "Ex. A," pp. 15-19).[5]

After witnessing Mr. Hernandez-Escobar conduct a number of drug transactions in the Tenderloin, police obtained his identity, and address (in Oakland). (Id.). While conducting surveillance of Mr. Hernandez-Escobar, on December 11, 2019, they eventually saw an unknown Hispanic male, later identified as Mr. Cruz-Cruz, who appeared to live with him. They also saw Mr. Cruz-Cruz drive him from Oakland and San Francisco. Then on December 24, 2019, police observed Mr. Cruz-Cruz standing near Mr. Hernandez-Escobar while he (Hernandez-Escobar) appeared to be conducting drug transactions. (Id. at 18). Officer Hayes opined in her warrant affidavit that Mr. Cruz-Cruz was displaying "behavior consistent with acting as a 'lookout' for Mr. Hernandez-Escobar." (Id.). Thereafter, Officer Hayes obtained arrest and search warrants for each defendant and their residence based on evidence that they were engaged in a drug trafficking conspiracy. (Id. at 18-19).

On December 27, 2019, police conducted surveillance outside of the defendants' residence. They watched Mr. Cruz-Cruz drive Mr. Hernandez-Escobar from Oakland to San Francisco. When the two arrived in the Tenderloin, police executed the warrants and located drugs on each defendant. While the more active drug dealer Mr. Hernandez-Escobar possessed 7.1 grams (net) of cocaine base, Mr. Cruz was holding significantly more, all contained in a sock

---

[5] See Exhibit A to Declaration of Marja-Liisa Overbeck in Support of The United States' Sentencing Memorandum for co-defendant Guillermo Hernandez Escobar (ECF Doc 32-2, filed 8/5/20), hereinafter referred to as "Ex. A." This Exhibit contains the police reports and warrant affidavit that comprises the bulk of discovery in this case.

in his left front pocket:[6] 36.3 grams (gross) of cocaine base, 9 grams (gross) of methamphetamine, and 8.1 grams (gross) of heroin.  Thereafter, police searched their residence, which appeared to house two other males as well.  There they found $1468[7] and packaging materials in Mr. Hernandez-Escobar's room, and 8.2 grams (gross) of methamphetamine in Mr. Cruz-Cruz's room.  These drugs are the basis for the charges in the Indictment, and do not account for any of Mr. Hernandez-Escobar's earlier (or subsequent) conduct.

On February 11, 2020, a grand jury indicted the defendants, who were thereafter arrested on the federal warrant in the following weeks.  As noted by the government in its earlier sentencing memorandum, when Mr. Hernandez-Escobar was arrested, he possessed additional drugs on his person: 31.76 grams of methamphetamine, 30.9 grams of heroin, and 40.4 grams of cocaine base.  This arrest alone yielded a more significant quantity of drugs for Guidelines purposes than those alleged in all of the filed charges against Mr. Cruz-Cruz.  Yet none of that is considered as "relevant conduct" for Mr. Hernandez-Escobar.  Nonetheless, the government insists that a sentence of 27 months – over four times as long as the sentence handed down to Mr. Hernandez-Escobar – is reasonable and appropriate for Mr. Cruz-Cruz.

## **PERSONAL HISTORY AND CHARACTERISTICS**

David Eduardo Cruz-Cruz is one of the many Central American – and particularly Honduran – defendants that have appeared before this Court in the government's dozens of F.I.T. cases.  Like many others, he fled abject poverty and violence to not only seek a better life in the U.S., but be in a position to help his family financially.

Mr. Cruz-Cruz was born in the small rural village of El Escanito, Honduras.  His parents were never married and his father left when he was about two or three months old.  He has three

---

[6] Perhaps this was the "stash" that Hernandez-Escobar had Mr. Cruz-Cruz hold while Hernandez-Escobar engaged in the transactions.
[7] This was the only money found in the apartment.

siblings, all of whom grew up in a small one-room home without electricity and with running water that was turned on only every few days. His mother, who did odd jobs including baking and selling bread, was often only able to provide one meal per day; as a result, the family often went hungry.

Mr. Cruz-Cruz and his siblings would often help their mother by working. Mr. Cruz-Cruz eventually had to stop going to school to work. Moreover, his mother began having health issues (including migraines and depression) that required regular medication, which she often could not afford. Meanwhile, the situation in Honduras continually got worse,[8] including increasing violence and gang wars, poverty, and corruption. Mr. Cruz-Cruz felt he needed to leave home to find work and a better life, and thereby help support his family and pay for his mother's medical needs. The entirety of his family remains in Honduras.

He made the treacherous journey through Guatemala and Mexico, including riding the notoriously dangerous freight train call "La Bestia."[9] The poor migrants who travel this route, especially those who ride La Bestia, are notoriously vulnerable to extortion and violence from gangs and other organized crime groups. Like so many others in a similar position, Mr. Cruz-Cruz describes the threats, robberies, rapes, and violence that occurred, as well as dealing with hunger and environmental conditions, such as extreme heat and cold. He also became indebted to a ring of "coyotes" in order to cross the border. Those individuals knew of family both in the

---

[8] According to the U.S. Agency for International Development (hereinafter "USAID"): "Honduras remains one of the poorest countries in Latin America. Approximately 60 percent of the country's population lives in poverty and 23 percent of children suffer from stunting as a result of chronic malnutrition." See USAID – What We Do – Food Assistance Fact Sheet – Honduras (Sept. 30, 2019), at https://www.usaid.gov/honduras/food-assistance (August 4, 2020).

[9] "Migrants riding La Bestia are likely to be some of the poorest, as the costs of riding the train (bribes, gang tariffs, etc.) still are cheaper than paying a smuggler to organize and facilitate the journey." See Rodrigo Dominguez Villegas, Migration Policy Institute, Central American Migrants and "La Bestia": The Route, Dangers, and Government Responses, Sept. 10, 2014, available at https://www.migrationpolicy.org/article/central-american-migrants-and-"la-bestia"-route-dangersand-government-responses (last accessed April 30, 2020).

U.S. and in Honduras and therefore the threat of violence against them required that Mr. Cruz-Cruz satisfy this costly financial obligation.

After crossing the border, Mr. Cruz-Cruz lived in various states and cities, as well as in Canada.  He moved to find opportunity and work.  Give his undocumented status, he had to find whatever employment was available.  This usually involved manual labor, often in construction, on an inconsistent basis.  Nevertheless, he was usually able to find enough work to not only support himself, but also to send money to his family back home, including the mother of his children.  After paying for his rent, food, and other expenses, he would often send $300-400 per month to Honduras; when he could not find much work, he would still usually send $100 or more to them.  This allowed his mother to buy her medication and assisted the family with others living expenses.

Mr. Cruz-Cruz has been in a relationship with Glenda Quiroz for a number of years.  They have three children, two of whom live with Ms. Quiroz in Denver, CO and one of whom lives with her mother in Honduras.  When Ms. Quiroz came to the U.S. about three years ago, she brought their oldest child, Zoami, who was thought to be strong enough to make the journey, while leaving their then youngest (1 year old at the time) with her mother in Honduras.  Ms. Quiroz was admitted to the U.S. on an asylum petition and has been living with her uncle in Denver.  Mr. Cruz-Cruz and Ms. Quiroz also have a third child, one-year-old Iraiza, who was born in the U.S. and resides with Ms. Quiroz.  While Mr. Cruz-Cruz and Ms. Quiroz's relationship has been on and off again, the two are close and the plan was for Mr. Cruz-Cruz to move to live with her in Denver prior to his arrest in this case.[10]  She confirms that he is a good father who has always been financially and emotionally supportive of her and their children, including regularly sending her money in Honduras while he was in the U.S.

---

[10] Mr. Quiroz remains supportive of Mr. Cruz-Cruz and agreed to act as a surety for Mr. Cruz-Cruz's release.

Unfortunately, like many others, Mr. Cruz-Cruz could not always find work. He regrets his decision to commit the crimes herein, but did so to support himself and attempt to help his family. He accepts full responsibility for these transgressions.

## SENTENCING CONSIDERATIONS

In determining a reasonable and appropriate sentence, the Court must consider those factors set forth in 18 U.S.C. 3553(a), including the nature and circumstances of the offense and the history and characteristics of the defendant. The Guidelines are advisory, *Gall v. United States*, 552 U.S. 38, 46-47 (2007), and there is no presumption in favor of a Guidelines' calculation. (*Nelson v. United States*, 555 U.S. 350, 352 (2009) (citation omitted) ("Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable. In *Rita* we said as much, in fairly explicit terms: "'[T]he sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply.'"). The District Court is thus not required to use a formulaic approach to produce a mathematical justification for a non-Guidelines sentence. (*Gall*, 128 S.Ct at 596.). Rather, it must exercise a "reasoned sentencing judgment, resting upon an effort to filter the Guidelines' general advice through § 3553(a)'s list of factors. (*Rita v. United States*, 127 S. Ct. 2456, 2469 (2007).). In short, the District Court's duty is to impose the least amount of time necessary to achieve 3553(a)'s purposes. The Guidelines are subordinate to that duty.

**A. This Court should reject the crack cocaine Guidelines and apply a 1:1 ratio**

Under *Kimbrough* and *Spears*, this Court has the power to reject the Guidelines' disparate treatment of crack and powder cocaine as it ultimately appears happened for his Mr. Cruz-Cruz's codefendant, and adopt an alternative ratio it deems reasonable. Mr. Cruz-Cruz asks this Court to vary downward and effectively adopt a 1:1 ratio.

Even before the FSA decreased the disparity between crack and powder cocaine sentences, many district courts rejected the 100:1 ratio and instead adopted parity for cocaine offenses. (*See e.g.*, *United States v. Whigham*, 754 F. Supp. 2d 239, 246 (D. Mass. 2010); *United States v. Greer*, 699 F. Supp. 2d 876, 880 (E.D. Tex. 2010); *United States v. Henderson*, 660 F. Supp. 2d 751, 754 (E.D. La. 2009); *United States v. Lewis*, 623 F. Supp. 2d 42, 43 (D.D.C. 2009); *see also United States v. Peterson*, 2013 WL 2181104, *1 (D.S.D. 2013) (unpublished); *United States v. Williams*, 2010 WL 1325229, *8 (S.D. Ill. 2010) (unpublished); *United States v. Medina*, 2009 WL 2948325, *1 (S.D. Cal. 2009) (unpublished)). That includes Judge Wilken here in the Northern District of California. (*See United States v. Gardner*, CR 09-203-CW).

The leading pre-FSA decision adopting a 1:1 ratio is *United States v. Gully*, 619 F. Supp. 2d 633 (N.D. Iowa 2009). Judge Bennett noted the Supreme Court's finding in *Kimbrough* that the Guidelines' disparate treatment of crack and powder cocaine was not due to empirical analysis but instead "is the result of congressional mandates that interfere with and undermine the work of the Sentencing Commission." (*Id*. at 641). He examined how the Commission had found that the assumptions about the harmfulness of crack cocaine, like the increased violence associated with the drug, were not in fact supported by later research and data. (*Id.*). The court noted that the disparity punished low-level crack cocaine dealers more harshly than major powder cocaine traffickers, and had a disproportionate effect on African American defendants, which leads to disrespect for and lack of confidence in the criminal justice system. (*Id.*). Judge Bennett believed that even if there were concerns about crack offenses involving weapons or violence, those harms could be addressed in specific cases when they arose, rather than by a categorical assumption that those risks are present in, and require heightened Guideline ranges, for *every* crack cocaine offense. (*Id.*).

As Judge Bennet noted after passage of the FSA, Congress and the Sentencing Commission did not remedy any of these problems, and the "'new' 18:1 guidelines still suffer from most or all of the same injustices that plagued the 100:1 guidelines." (*Williams*, 788 F. Supp. 2d at 892). Like the 100:1 ratio, the FSA's 18:1 ratio was not based on specific findings supported by empirical study and research. Rather, it was "a political compromise having no empirical rationale" between those who favored the complete elimination of the crack/powder disparity and those who believed that crack offenses should continue to be punished more severely than powder offenses. (*Gardner*, 20 F. Supp. 3d at 471). Unsupported by new findings, research or data, the post-FSA 18:1 ratio perpetuates the same harms present in the 100:1 ratio.

While this District now has more crack cocaine cases on its docket as a result of the "Federal Initiative in the Tenderloin," the government has failed to provide any empirical rationale or justification for why this renewed attention to crack cocaine supports the 18:1 ratio. Crack cocaine did not change chemically. Nor can it be due to an increase in violent crime, because San Francisco's violent crime rate has dropped the last two years *before* the "Federal Initiative in the Tenderloin" operation.[11]

In sum, the government has not presented "a single scintilla of medical, chemical, physiological, or other scientific or social science evidence to support its position" for the 18:1 ratio. (*Williams*, 788 F. Supp. 2d at 851). The better approach is to adopt a 1:1 ratio in *every* crack cocaine case and to enhance sentences for individual defendants whose offenses actually involved firearms, bodily injury or other dangerous conduct. (*See Gully*, 619 F. Supp. 2d at

---

[11] *See* Wilson Walker, "San Francisco talks fear and frustration despite falling crime rates," *CBS SF Bay Area*, Aug. 21, 2019, ("According to San Francisco Police Department data, crime is down in San Francisco, and it's been declining for at least a year and a half. Homicides in San Francisco are flirting with a 50 year low, and violent crime categories were not only down last year, they are down again, so far, this year."), *available at* https://sanfrancisco.cbslocal.com/2019/08/21/san-francisco-crime-at-lowest-level-in-decades-officials-say/.

644). This Court should therefore reject the 18:1 ratio when sentencing Mr. Cruz-Cruz and vary downward. It would not be the first to do so nationally, or locally. (*See, e.g., Gardner*, 20 F. Supp. 3d at 473; *Shull*, 793 F. Supp. 2d at 1064; *Williams*, 788 F. Supp. 2d at 851; *see also United States v. Cousin*, 2012 WL 6015817, *5 (W.D. Penn. Dec. 1, 2012)). Nor would it be the first to do so in the Northern District. (See *United States v. Lambert*, 18-149-YGR (N.D. Cal.) (granting a variance from the crack cocaine Guideline range because there is scientific evidence to justify the 18:1 ration); see also *United States v. Henry*, CR 15-460-JD (N.D. Cal.) (agreeing with the policy objection to treating crack cocaine or cocaine base as anything other than a 1-to-1 ratio to avoid unwarranted disparity).

### B. The Court should ensure non-disparate results between Mr. Cruz-Cruz and his co-defendant, as well as others similarly situated

As is clear from the discovery in the case, and as summarized by the government in its sentencing memorandum for Mr. Hernandez-Escobar, the evidence shows that Mr. Hernandez-Escobar was consistently engaged in drug dealing in the Tenderloin over the course of many months. Indeed, SFPD's own warrant affidavit paints a picture of an actively engaged drug dealer who used Mr. Cruz-Cruz as a lookout, a driver, and perhaps as a stash holder. All accounts show Mr. Hernandez-Escobar as the more active of the two. It is therefore not surprising that all of the money found in the defendants' residence was in Mr. Hernandez-Escobar's room. Moreover, his co-defendant's arrest on the federal warrant – and possession of more drugs than is involved in this case – further justifies a variance to avoid inappropriate disparity.

While the Court must avoid unwarranted sentencing disparities among defendants with similar records convicted of similar conduct, the Ninth Circuit has explained sentencing courts must also "avoid 'unwarranted similarities among [defendants] who were not similarly

situated.'" *United States v. Amezcua-Vasquez*, 567 F.3d 1050, 1058 (9th Cir. 2009) (quoting *Gall*, 552 U.S. at 55 (emphasis and brackets in original)); *see also* 18 U.S.C. § 3553(a)(6).

A time served sentence of approximately eight months avoids unwarranted similarities with defendants who are higher up the drug distribution chain, are armed or use threats of violence while selling drugs. A time served sentence would avoid unwarranted disparity with his co-defendant, as well as other defendants sentenced for similar drug dealing in the Tenderloin. Numerous defendants have received significant sentencing variances, including time served sentences, even before the COVID-19 pandemic. The current public health crisis – and Mr. Cruz-Cruz's transmission of the virus – only heightens the urgency and propriety of releasing Mr. Cruz-Cruz from prison immediately.

| Name | Case No. | Drug | CHC | USSG Range | Sentence | Priors |
|---|---|---|---|---|---|---|
| Wilson Acosta-Valle | 19-560-VC | Crack, heroin | II | 8-14 | 111 days | Federal drug case |
| Santos Aguilar | 19-454-VC | Heroin, meth | II | 15-21 | 152 days | Illegal reentry |
| Brayan Arteaga | 19-426-WHO | Crack | II | 8-14 | 37 days | |
| Wilfredo Cabrera | 19-452-WHO | Heroin | II | 8-14 | 132 days | 4 year drug sentence; 6 deports |
| Welbur Cardona-Navarro | 19-541-WHO | Heroin, crack | III | 24-30 | 12 months + 1 day | 2 illegal entries |
| Yerlyn Cruz-Ortiz | 19-453-SI | Crack | V | 21-27 | 15 mo | On supervised release for illegal reentry |
| Ronny Dixson | 19-527-WHO | Heroin | III | 18-24 | 12 months + 1 day | 8 drug felonies, including sales |
| Jesus Flores | 19-429-SI | Cocaine, heroin, meth | I | 10-16 | 118 days | 2 deports |
| Ismael Martinez | 19-650-RS | Crack, meth | I | 0-6 | 48 days | |
| David Medina-Guerrero | 20-26-RS | Crack | III | 10-16 | 83 days | |
| Pedro Muncia | 19-428-CRB | Heroin, crack, meth | II | 8-14 | 126 days | Federal drug case, deport |
| Jose Ramos-Varela | 19-713-EMC | Meth | I | 10-16 | 57 days | |
| Anival Ramos- | 19-503- | Heroin, crack | I | 6-12 | 111 days | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Velasquez | EMC | | | | | |
| Aaron Servellon | 19-689-RS | Crack, heroin, meth, fentanyl | I | 12-18 | 102 days | |
| Ristir Trejo | 19-535-RS | Fentanyl, crack, heroin | II | 21-27 | 140 days | |
| Luis Vargas-Valle | 19-386-RS | Crack | II | 8-14 | 6 months | 32 month illegal reentry sentence |
| Kelier Velasquez-Jossel | 19-483-EMC | Crack | I | 6-12 | 125 days | |
| Marco Velasquez-Trinidad | 19-456-WHO | Crack | I | 6-12 | 120 days | |
| Corey Wyatt | 19-396-RS | Alprazolam | VI | 6-12 | 99 days | Involuntary manslaughter, assault with deadly weapon |
| Arnulfo Estrada | 19-546-CRB | 95 bindles of crack (13.9g), 11g meth, 6.1g heroin | I | 18-24 | 3.5 months | |
| Aaron Servellon | 19-689-RS | 64g crack, 38.7g meth, 28g fentanyl, 42g heroin | I | 12-18 | 3.25 months | |
| Seth Carus | 19-305-RS | Significant amount of fentanyl | I | 37-46 (likely) | Diversion | |
| Delmar Rosales-Avila | 19-536-VC | Fentanyl | III | 15-21 | 193 days | Felony accessory |

### C. The Guidelines, fail to take into account the punitive nature of serving prison time during a global pandemic and transmitting a deadly virus as a result

Mr. Cruz-Cruz has been housed at the Santa Rita Jail continuously since his arrest in February of 2020. Since March of 2020, as the Court is well aware, the jail has been in a state of continuous lockdown due to the COVID-19 pandemic. Programming and visitation have ceased. Quarantines and 23-hour lockdowns are a regular occurrence. The fear of COVID-19 infection is constant. Most importantly, Mr. Cruz-Cruz was one of the unlucky inmates who transmitted the virus, which appears to have occurred as a result of him volunteering to work while in custody.

Mr. Cruz-Cruz was placed in isolation/quarantine, and tested positive for COVID-19 in July, 2020. He experienced difficulty breathing, aches and pains, and lost significant weight due to the illness. Moreover, the fact that he contracted, and apparently recovered from, the virus does not mean that he does not remain at risk: as this Court observed, "the scientific community has not, as of this date, determined whether a prior infection produces immunity or affects the severity of any potential subsequent infection." (See *United States v. Schaffer*, No. 13-cr-0020 MMC, ECF Doc. 40 at 2 (June 24, 2020)). Indeed, that concern of potential reinfection has now been proven.[12] Moreover, as is well known – and illustrated in this case – inmates are at a three times higher risk of contracting the virus.[13] Even if Mr. Cruz-Cruz does become re-infected, it has been widely reported that patients in recovery from COVID-19 may suffer from persistent symptoms, including respiratory distress, for months to years.[14] Here, even if the Court were to sentence Mr. Cruz-Cruz to "time served," he is almost certain to be transferred to the custody of immigration authorities for weeks to months prior to removal. The longer he remains in custody, the greater the risk to his health.

To put it plainly, the Sentencing Guidelines were not drafted to take into account contracting a deadly virus in the middle of a pandemic. Nor did they consider the significantly diminished quality of life of, and increased fear for, an inmate serving time during a pandemic. While the outside world struggles to manage life in the face of rising infection rates, the picture is even grimmer in custody. As a result, a sentence of "time served" is much more severe now than it was previously. He therefore asks the Court to consider his illness and these dire

---

[12] See Man, 25, Catches Coronavirus Twice in First Such US Case, The Guardian, October 14, 2020, at https://www.theguardian.com/world/2020/oct/13/man-25-catches-coronavirus-twice-in-first-such-us-case?CMP=Share_iOSApp_Other.
[13] Brendan Saloner, et al., COVID-19 Cases and Deaths in Federal and State Prisons, Journal of the American Medical Association, Pub. Online July 8, 2020, at https://jamanetwork.com/journals/jama/fullarticle/2768249 (August 5, 2020).
[14] Centers for Disease Control, Coronavirus Disease 2019, at https://www.cdc.gov/coronavirus/2019-ncov/hcp/faq.html (August 5, 2020).

circumstances, when considering a downward variance and the appropriate sentence in this case.

**D. Mr. Cruz-Cruz's personal circumstances warrant a downward variance**

Mr. Cruz-Cruz's personal history and circumstances also warrant a variance. He was born impoverished in a country that has been experiencing severe poverty, violence, and corruption, all of which led him to making the perilous journey north for a better life. Moreover, a primary reason for his travel to the U.S. has been a desire to assist his family financially. Since he has been here illegally and is minimally educated, employment options are limited. While none of this justifies his commission of these crimes, it nonetheless provides mitigating context that is appropriate for this Court to consider in imposing a sentence.

## CONCLUSION

Given the reasons cited above, Mr. Cruz-Cruz respectfully requests that this Court impose a sentence of "time served."

Dated: October 15, 2020                Respectfully Submitted:

_____/s/_____
Adam Pennella
Counsel for David Eduardo Cruz-Cruz